HARRY T. SILVERMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Silverman v. Commissioner
Docket Nos. 7140-73, 9190-74.
United States Tax Court
T.C. Memo 1985-515; 1985 Tax Ct. Memo LEXIS 116; 50 T.C.M. (CCH) 1226; T.C.M. (RIA) 85515; September 30, 1985. Michael D. Hess and David B. Stern, for the petitioners. David M. Brandes and Robert A. Wagner, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined deficiencies in petitioner's 1969 and 1970 Federal income taxes in the amounts of $418,814.94 and $416,135.63, respectively. After concessions, the issue for our decision is whether capital gains and losses arising from security accounts are to be attributed to petitioner *117 or to his relatives in whose names the accounts were carried. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in New York, New York, at the time he filed his petition in these cases. In 1969, petitioner received approximately $6 million from the liquidation of Dorset Products. After the liquidation, he was financially content and wanted to give financial aid to his four sons: Richard, Jeffrey, Barry, and Kenneth. During the years at issue, Richard was married to Heather, Jeffrey was married to Pamela, and Kenneth was married to Ginger. From the latter part of 1968 through the early part of 1970, petitioner transferred to his sons' and their wives' ("the Silverman children") brokerage accounts the following amounts: Transferee
Amount
Heather
$1,884,707
Pamela
834,790
Barry
882,357
Kenneth and Ginger
715,883
He did not consult with lawyers or accountants and no documents were drafted. Furthermore, he did not charge interest on the principal, fix a date for repayment, or obtain security. The understanding between *118 petitioner and the Silverman children was that the money in the brokerage accounts would be used to purchase securities. Richard, a successful broker, would manage the accounts. Petitioner would retain ownership of the assets in the accounts and the Silverman children would receive, at sometime in the future, any profits earned. During the years in issue, petitioner maintained a tie-line to Richard's office and was in frequent contact with him regarding the investments. Petitioner from time to time withdrew funds and securities. On one occasion, he used approximately $260,000 of securities from Heather's account as collateral for a demand note. Conversely, the Silverman children had little contact with Richard regarding the activity in the accounts, made no deposits or withdrawals, and could not obtain any of the assets. Their only involvement with the accounts was the receipt of brokerage statements. Richard held a power of attorney allowing him to manage the accounts. His decisions, however, were subject to petitioner's approval. Petitioner expected Richard to enter into profitable transactions and no one ever considered the possibility of losses. Unfortunately, large *119 losses were incurred. During 1969 and 1970, the following gains and losses were incurred and reported on the Silverman children's income tax returns: 1969
Sales
Gain or
Long-Term or
Security
Price
Cost
(Loss)
Short-Term
Heather's Account
Amk stock
$ 50,098
$ 49,706
$ 392 Short-Term
AMK bonds
68,528
67,925
603 Short-Term
AMK warrants
53,514
52,500
1,014 Short-Term
Armour stock
2,846,996
2,742,012
104,984 Short-Term
Host warrants
203,954
358,334
(154,380)
Short-Term
Host Bonds
1,234,115
1,464,970
(230,855)
Short-Term
Host warrants
225,073
930,207
(705,134)
Long-Term
UF stock
1,927,724
1,875,645
52,079 Short-Term
Pamela's Account
Armour stock
$ 729,561
$ 697,066
$32,495 Short-Term
Host bonds
318,549
387,030
(68,481)
Short-Term
Barry's Account
Armour Stock
$ 834,034
$ 795,256
$38,778 Short-Term
Host bonds
272,080
331,172
(59,092)
Long-Term
Host Warrants
36,912
37,968
(1,056)
Short-Term
Host Warrants
17,202
101,760
(84,558)
Long-Term
UF stock
317,211
301,443
15,768 Short-Term
Kenneth's Account
Armour stock
$1,137,427
$1,060,008
$77,419 Short-Term
Host bonds
346,900
399,000
(52,100)
Long-Term
Host warrants
76,322
86,786
(10,464)
Short-Term
Host warrants
7,595
37,969
(30,374)
Long-Term
UF Stock
171,458
166,195
5,263 Long-Term
1970
Barry's Account
Host warrants
$ 23,751
$ 173,031
(149,280)
Long-Term
Kane stock
2,325
4,731
(2,406)
Short-Term
S stock
2,311
6,456
(4,145)
Short-Term
Kenneth's Account
Host warrants
$ 46,847
$ 332,226
(285,379)
Long-Term
S stock
2,091
20,747
(18,656)
Long-Term
*120 On their income tax returns for 1969 and 1970, the Silverman children also reported interest and dividend income from the accounts. On his income tax return for the year 1970, petitioner included the following gains and losses from securities held in the names of Heather and Pamela: Claimed per return
Short-Term
Long-Term
Securities Sold
Capital Gain (Loss)
Capital (Loss)
71,015 General Host Warrants
$ (12,573.01)
200 United Dollar
81.68 2,600 Corp S
(35,360.28)
4,300 Anthony Kane
(27,955.21)
50,000 General Host Warrants
(5,923.61)
1,700 Corp S
(44,193.00)
2,000 Anthony Kane
$ (13,115.04)
Total
$ (125,923.43)
$ (13,115.04)
By the end of 1970, the Silverman children had transferred back to petitioner the following amounts: Transferee
Amounts Transferred to Petitioner
Heather
$620,034
Pamela
351,499
Barry
616,102
Kenneth and Ginger
396,562
On the advice of petitioner's accountant and an attorney whom petitioner's accountant consulted, petitioner took nonbusiness bad debt deductions relating to the transferred funds as follows: 1969
Heather Silverman
$1,114,672.44
Pamela Silverman
408,291.00
1970
Barry Silverman
$ 211,829.43
Kenneth Silverman
300,374.94
*121 Petitioner did not misrepresent or conceal material facts and respondent had knowledge of all relevant facts. Respondent denied both the bad debt deductions and net capital loss in 1970. Petitioner now contends that all the deductions in question should have been reported as capital losses. OPINION We must determined the Federal income tax consequences of monetary transfers from petitioner to accounts in the names of the Silverman children and the subsequent loss of that money from security transactions. If the transfers were loans, petitioner may be entitled to nonbusiness bad debt deductions. See section 166(d). [1] If the transfers were gifts, petitioner is not entitled to any deduction. If, despite the Silverman children's nominal ownership, petitioner remained the owner of the money for Federal income tax purposes, he is entitled to capital loss deductions. See section 165(a). Petitioner contends that he retained control over the transferred money and, therefore, is entitled to capital loss deductions. Conversely, respondent contends that *122 petitioner is not entitled to such deductions because he relinquished control. Respondent further contends, and petitioner does not dispute, that the transfers were not loans. We conclude that the transfers were neither loans nor gifts. For Federal income tax purposes, petitioner owned the money and, therefore, is entitled to deductions for the capital losses. Prerequisites for a bad debt deduction are a clear showing that the parties intended to create a debtor-creditor relationship and further that a debt in fact exists. , affd. per curiam . Indicia of a debtor-creditor relationship are a note or other written evidence of the transaction, interest charged on the principal, a fixed date for repayment, , and a provision for security. . Here, no debtor-creditor relationship existed; neither the necessary intent nor enumerated indicia is present. The transfers also were not gifts. Essential elements of a valid gift are donative intent and a transfer *123 relinquishing the right to control. , affd. . Cf. . Here, petitioner did not intend to transfer the money as a gift. Furthermore, as discussed below, he did not relinquish the right to control. Petitioner intended to retain ownership of the money, have Richard invest it, and then, at some time in the future, give the Silverman children the profits. The right to control an account is evidenced by withdrawals. Petitioner from time to time made withdrawals and, on one occasion, used $260,000 of securities as collateral for a demand note. The Silverman children made no withdrawals. Petitioner had frequent contact with Richard regarding the investments and the Silverman children had little involvement with the accounts. Transferring legal title to property to the name of another does not, of itself, control the question of ownership. Here, the nominal owners' receipt of brokerage statements and inclusion of gains, losses, and income from the accounts fails to convince us that they are to be *124 regarded as the true owners of the accounts for income tax purposes. Because of petitioner's control over the accounts, we find that he was the owner of the funds for Federal income tax purposes. , affd. ; . Indeed, the facts in Taylor are strikingly similar to the present facts. In Taylor, a generous taxpayer advanced sums to establish commodity accounts in the names of three relatives. It was an informal arrangement with no written agreement. The taxpayer intended to trade in the accounts and turn them over to the nominal owners when each account had a profit of $100,000. Under powers of attorney granted by the nominal owners, the taxpayer exercised control over the accounts and, during 1946 and 1947, the taxpayer executed numerous commodity transactions. Although the relatives received the brokerage statements, the taxpayer included the profits and losses from two of the accounts on her income tax return for 1946. The net profits earned in 1947 were reported by the relatives. In *125 1948, the accounts were wiped out because of a drastic drop in the price of commodities. At that time, the taxpayer had withdrawn a total of $10,200 and the relatives had not reimbursed the taxpayer for the losses. Respondent determined that the profits and losses from the accounts for the years 1946 and 1947, were reportable by the taxpayer. We agreed with respondent. The facts showed merely an intent to make a gift to the relatives at some future time, and until that time arrived, the property was for tax purposes, that of the taxpayer. Respondent attempts to distinguish Taylor by stating that the nominal owners in Taylor were "completely subservient." Respondent supports his contention by noting that the taxpayer in Taylor had a power of attorney and Mr. Silverman did not. We do not agree with respondent that the taxpayer in Taylor had a greater degree of control than petitioner in the present case. Petitioner had complete control over the accounts. The Silverman children's involvement with the arrangement was negligible and, even though Richard held powers of attorney allowing him to manage the accounts, his managerial decisions were subject to petitioner's *126 approval. Respondent also argues that only the taxpayer in Taylor deposited funds into the accounts, whereas in the present case, the nominal owners deposited and withdrew funds. We, however, have found that the Silverman children did not make deposits or withdrawals. Respondent's final distinction is that the Silverman children were more than nominal owners because they received brokerage statements and reported the tax consequences of the accounts as their own. In Taylor, the nominal owners received brokerage statements and reported transactions from the accounts in at least one year. Alternatively, respondent contends that petitioner is not entitled to claim the losses because he had no objective of profit from the transactions. See , affd. . This argument bears no relation to the question of ownership and control which is the central issue here. Profits and losses follow control. Petitioner, however, did intend a profit which would have been turned over to his children. Losses were never considered. If the contemplated scenario had happened, *127 the parties would have been on opposite sides of the fence and respondent would be the winner as in Taylor and Applestein.
Finally, respondent contends that petitioner is estopped from claiming capital losses because he claimed nonbusiness bad debt deductions on his tax return. The elements usually required for equitable estoppel to be applied are: (1) Conduct amounting to a misrepresentation or concealment of a material fact; (2) actual or imputed knowledge of the misrepresentation by the party to be estopped; (3) absence of knowledge of facts by the party in whose favor estoppel is applied; (4) intention or expectation of the party to be estopped that the representation or concealment will be acted upon by the other party; (5) reliance by the party seeking the estoppel; and (6) detriment to the party seeking the estoppel resulting from his reliance. [.] In the present case, estoppel is inapplicable. It requires a misrepresentation or concealment of a factual matter, rather than a mistake in applying the law. . *128 Here, no facts were misrepresented or concealed, and respondent had knowledge of all material facts. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩